## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION NO.** |
| **Plaintiff,** | **1:18-CR-460-LMM-CCB** |
| **v.** | |
| **KEVIN HUDSON,** | |
| **Defendant.** | |

### FINAL REPORT AND RECOMMENDATION

Defendant Kevin Hudson is charged with one count of possessing ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 27). The matter is now before the Court for consideration of Defendant's motions to suppress statements and any evidence recovered from his phone. (Docs. 21, 22). For the reasons set forth below, the motions should be **DENIED**.

### I.    Facts

Agents with the Bureau of Alcohol, Tobacco, and Firearms (ATF) executed a federal search warrant at Defendant's house at approximately 6:00 a.m. on May 17, 2017. (Doc. 43 at 7–8). Defendant was removed from the house, placed in handcuffs, and he was initially standing on the front porch. *Id.* at 9. One agent

testified that when Defendant was first brought out of the house, he was either naked or wearing only underwear. *Id.* at 61. Another agent testified that he approached the house "once the scene was secured," and then Defendant was wearing a bathrobe. *Id.* at 8–10.

### A. The Outside Interview

ATF Special Agent Bowling said that he walked Defendant from the porch to an area in front of the garage, where Defendant sat down. *Id.* at 9–10; Gov. Exh. 2. Agent Bowling introduced himself, told Defendant that they had a search warrant for his house, and read him *Miranda* rights from a pre-printed card. (Doc. 43 at 10–11). That card has these statements and questions:

> Before I ask you any questions, I want to explain your rights to you.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in a court of law.
>
> You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning.
>
> If you cannot afford a lawyer, one will be appointed to represent you free of charge prior to any questioning.
>
> Do you understand your rights?
>
> Are you willing to waive these rights and talk to me now without a lawyer being present?

(Gov. Exh. 3). The agent testified that Defendant said that he understood his rights and that when the agent asked if Defendant wanted to waive those rights and speak, Defendant said "yeah, I'm just trying to figure out what's going on." (Doc. 43 at 30). The agent asked Defendant if there was anything in the house that could hurt those who were searching, and Defendant said there was a .22 pistol in his bedroom—although he had not seen it in a couple of days. *Id.* at 12. That was the end of the interview outside, which the agent did not record (although he testified that he had no excuse not to record it and should have). *Id.* at 13, 24, 26–27.

During the outside interview, Agent Bowling was wearing khaki pants and a shirt. *Id.* at 14. He was armed, although he never removed his pistol from its holster. *Id.* He did not threaten Defendant, make him any promises, or use any physical force. *Id.* at 14–15. Defendant was handcuffed during the interview, he was calm and coherent, he did not appear to be under the influence of drugs or alcohol, and although he had just woken up, he was coherent and alert. *Id.* at 15. He never invoked his right to remain silent or asked to speak with a lawyer. *Id.* at 15–16.

### B.  The First Inside Interview

Around 7:30 a.m., Agent Bowling brought Defendant inside the house. *Id.* at 16. The agent removed the handcuffs, and Defendant sat at the dining room

table. *Id.* They were joined by Special Agent Heath Stewart. *Id.* at 16, 33. This interview was recorded. *Id.* at 18; Gov. Exh. 5. The agents reminded Defendant that he had been advised of his rights earlier and that they wanted him to read a form, which they handed to him. *Id.* at 17, 34; Gov. Exhs. 4, 5. The form states:

**Statement of Rights**

- You have the right to remain silent.

- Anything you say can be used against you in court.

- You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.

- If you decide to answer any questions without a lawyer present, you have the right to stop answering at any time.

**Waiver**

I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

(Gov. Exh. 4). There is a line on the form that bears a signature, above a line for a printed name, which reads "Kevin Hudson." *Id.* On the recording, an agent can be

4

heard telling Defendant that he wants Defendant to read the form. (Gov. Exh. 5).[1]

The agent tells Defendant that if Defendant signs the form, it does not mean he has

to talk to the agent, but is rather an acknowledgment that Defendant understands

that he has the listed rights. *Id.* After a pause, the agent asks Defendant if he is

"good to talk?" *Id.* It is hard to hear a response, but the agent shortly thereafter

asks a question that Defendant answers. *Id.* And at no point during the recording

does Defendant ever state that he wants to stop talking or that he would like a

lawyer to be present. *Id.* Both agents testified at the hearing that Defendant

appeared to read the form (they did not read it to him), and they witnessed

Defendant sign it. (Doc. 43 at 17–18, 27, 34–35, 44). There is a space on the form for

a witness signature, which is not completed. *Id.* at 18; Gov. Exh. 4.

The first inside interview lasted for approximately ten minutes. (Doc. 43 at

20). Neither of the agents unholstered their weapons, Defendant was not in

handcuffs, nobody used any physical force against Defendant, and neither agent

made him any promises. *Id*. Defendant was calm, he answered the agents'

questions, and he did not appear confused. *Id.* at 20, 35. The undersigned has

---

[1] The recording is just slightly over ten minutes long, and the relevant conversation regarding the statement-of-rights form takes place within the first two minutes.

listened to the ten-minute interview, and there is nothing on the recording that contradicts the agents' testimony. (Gov. Exh. 5). The interview ended because the agents wanted to "look further into" some of the information Defendant gave them before asking him additional questions. (Doc. 43 at 21).

### C. The Second Inside Interview

About ten minutes after the first inside interview concluded, Special Agents Stewart, Brian Williams, and Allen McLeod again spoke with Defendant. *Id.* at 37. Agent Stewart testified that he wanted to ask Defendant for consent to search a cell phone that they located during the search of the house. *Id.* at 37–38. The agent presented Defendant with three phones they had found in the house, Defendant identified the one that he uses, the agent asked him if he could search the phone, and Defendant agreed that he could. *Id.* The agent did not inform Defendant that he could refuse to consent, and this second inside interview was not recorded. *Id.* at 38, 47. Agent Stewart testified that he did not intentionally decide not to record the second inside interview—he said that it was either a technical error or that he simply failed to hit the button to turn on the recorder when they started the second interview. *Id.* at 38, 43. Agent Stewart briefly looked through text messages and photographs on the phone, some of which he discussed with Defendant. *Id.* at 39.

6

The second inside interview lasted about ten minutes, and Defendant was cooperative and mild-mannered throughout. *Id.* at 40.

When Defendant told Agent Stewart that he could search the phone, Agent McLeod—noticing that Agent Stewart did not have a written consent-to-search form—went out to his car to get one. *Id.* at 52–53, 62–63. Agent McLeod then presented the form to Defendant:

> Q:    When you brought the form…back to Mr. Hudson, do you recall what, if anything, you said to him about it?
>
> A:    Yes. I asked him as I ask everybody can you read and write. He said yes, and then I explained to him this was just a consent to search that phone, that one specific phone, not anything else. He's not—it's not an admission of guilt or anything, and to read through the form, if he's got any questions to ask us, and if he does not have any questions and he agrees, then to sign the bottom and write his name along with the date.
>
> Q:    Okay. Did you tell him that he could withdraw consent?
>
> A:    Yes, I said while we're here, you can just tell us if you decide not to search—for us to search it or if you think of something, and then I also provided a business card because I'm taking—in essence we were taking his phone so he would not be able to call us with that phone, and I leave a business card and said hey, if you want to withdraw consent at any time, give us a call.…

*Id.* at 56–57.

The form, titled "Consent to Search Computer/Electronic Equipment," makes clear that Defendant has the "right to refuse to consent" to the search. (Gov.

Exh. 6). It also states that Defendant has the right to withdraw consent. *Id.* Agent McLeod watched Defendant sign the form, and he (along with Special Agent Shawn Lee) signed as witnesses. (Doc. 43 at 54; Gov. Exh. 6). Defendant never told Agent McLeod that he wanted to withdraw his consent. (Doc. 43 at 57). Indeed, the agent returned to Defendant's house about a week later, and during that conversation Defendant did not ask for his phone back or withdraw his consent. *Id.* at 59.

Defendant was not arrested on the day of the search. *Id.* at 41. In fact, there was some discussion that Defendant could provide assistance to the agents in the future, but that possibility did not ultimately come to fruition. *Id.* at 58–59. Special Agent Bowling searched Defendant's phone again in September of 2019, at his office in Memphis, Tennessee. *Id.* at 22.

## II.   Defendant's Motions to Suppress Statements and Evidence from his Phone

Defendant argues that there is no "independent, objective evidence" that he was given *Miranda* warnings prior to the outside interview. (Doc. 49 at 7). And even if he did receive the appropriate warnings, he maintains that the statement he gave outside was not voluntary. *Id.* The later statements that he gave inside, he argues, were tainted by the earlier *Miranda* violation. *Id.* The Government argues

that Defendant was properly read his *Miranda* rights outside (even if not recorded) and that his statements were voluntary. (Doc. 53 at 8–10). And once inside, the Government argues, there was no need to administer those warnings again. *Id.* at 10–11. But even if the agents were required to re-Mirandize Defendant, they properly did so by having him read and sign the waiver form. *Id.* at 12.

Defendant argues that his consent to search the phone was not voluntary. (Doc. 49 at 10–12). The Government argues that it was. (Doc. 53 at 12–14). But even if it was not, the Government argues, the later search in September, which occurred well after Agent McLeod obtained Defendant's written consent to search, ratified the earlier, on-scene search. *Id.* at 14–15.

## A. The Outside Interview

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely

to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted).

Neither of the parties argue about the "custodial" or "interrogation" portions of the inquiry, and the Court assumes, without deciding, that Defendant was in custody and was subject to interrogation. Defendant does argue, however, that there is no "independent, objective evidence" that the agent gave Defendant *Miranda* warnings prior to the outside interrogation. (Doc. 49 at 7).

Agent Bowling testified that he read Defendant *Miranda* warnings from a pre-printed card, a copy of which the Government introduced at the suppression hearing. (Doc. 43 at 10–11; Gov. Exh. 3). He further testified that Defendant said that he understood his rights and that he was willing to waive his rights and talk to the agent. (Doc. 43 at 30). The Court finds credible Agent Bowling's testimony about the *Miranda* warnings that he read to Defendant and Defendant's willingness to speak. And the evidence is undisputed—there are no facts in the record suggesting that the encounter occurred other than the way that Agent Bowling described it.

Defendant argues that the agents have cast doubt on their own credibility (and, therefore, their testimonial account of what occurred) by recording some of the conversations with Defendant while failing to record others. (Doc. 49 at 7). It is somewhat frustrating that, over the course of just several hours, some of the

conversation with Defendant was recorded and some was not. But the Court does not find that the agents' failure to record each of the interviews calls into question the undisputed evidence about what occurred during the unrecorded portions. Agent Bowling's testimony about the *Miranda* warnings that he read from a pre-printed card—and Defendant's responses to the questions the agent asked him about whether he understood his rights and wanted to talk—is detailed and specific. (Doc. 43 at 10–11, 29–30). There is simply no evidence to support Defendant's suggestion that the agents "engaged in spoliation" by recording some portions of the interview and not others. (Doc. 49 at 7). And in light of the uncontradicted testimony, the Court finds that Defendant was properly read his *Miranda* warnings prior to the outside interview. *See United States v. Lewis*, No. 1:18-CR-369-WMR-JFK, 2019 WL 7503156, at * 13 (N.D. Ga. Oct. 1, 2019) (rejecting argument that an officer's undisputed testimony about having read *Miranda* warnings should be rejected because it was not corroborated), *adopted by* 2019 WL 6907509 (N.D. Ga. Dec. 19, 2019).

Defendant argues that his outside statements were not voluntary because SWAT-like agents woke him up at 6:00 a.m., removed him from his house naked or in only underwear, and held him outside for an hour and a half. (Doc. 49 at 7). Even though the Court has determined that there was no *Miranda* violation, it "still must determine that any confessions or incriminatory statements made by a

defendant were voluntary" before those statements can be admitted at trial. *United States v. Lazarus*, 552 F. App'x 892, 895 (11th Cir. 2014). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Here the factors weigh in favor of finding that Defendant's outside statements were voluntary. The length of the detention outside was exceedingly short—indeed, the agent asked only one question, about whether there was

anything in the house that could hurt anyone. (Doc. 43 at 12–13). The agent did not use any physical force against Defendant, nor did he make any threats or promises. *Id.* at 14–15. The agent, although armed, never removed his gun from his holster. *Id.* at 14. Defendant was calm and coherent. *Id.* With those facts, that Court simply cannot find that Defendant's outside statements were involuntary. Although Defendant argues that the interview occurred early in the morning, following a SWAT-like entry into the house while he was initially in only underwear or naked, those facts are less coercive than (or at least on par with) others that the Eleventh Circuit has found to result in a voluntary statement. *See, e.g., United States v. Vanbrackle*, 397 F. App'x 557, 562–63 (11th Cir. 2010) (finding statements voluntary even though approximately eight law enforcement officers made entry into the defendant's house, some with guns drawn, but holstered their guns during the interview and did not make threats or promises); *United States v. Johnson*, 379 F. App'x 964, 968 (11th Cir. 2010) (finding no coercion where the defendant's statements occurred at least 30 minutes after police battered down the defendant's door and placed him in handcuffs in the presence of crying children); *see also United States v. Vega-Gutierrez*, No. 1:15-CR-178-RWS-LTW, 2018 WL 7918059, at *9 (N.D. Ga. Nov. 5, 2018) (finding statements voluntary where, although defendant was initially removed from his residence at gunpoint and placed on the lawn in his underwear, by the time of the interview he was wearing jeans and a t-shirt),

13

*adopted by* 2019 WL 446227, at *1 (Feb. 5, 2019). Here, although there was an initial show of force, by the time of the interview Defendant was seated near his garage, he was wearing a robe, the agent had holstered his gun, and Defendant was calm and coherent. (Doc. 43 at 10, 14–15). Defendant's statement was voluntary.

**B.    The Inside Interview**

Defendant contends that the inside interview was involuntary and taken in violation of *Miranda* because he was previously questioned outside without warnings. (Doc. 49 at 7). But, as noted above, Defendant was properly Mirandized outside. So this is simply not a case where, as Defendant argues, the police used a "question first" tactic of the type that the Supreme Court found to violate *Miranda* in *Missouri v. Seibert*, 542 U.S. 600, 617 (2004). Defendant was read his rights outside, and he read and signed a *Miranda* waiver inside. (Doc. 43 at 10–11, 17–18; Gov. Exh. 4).[2]   None of his statements were obtained in violation of *Miranda*, none of them were involuntary, and Defendant's motion to suppress his statements, (Doc. 22), should be **DENIED**.

---

[2] Defendant argues that the waiver form does not contain an option for refusing to speak — it simply has a waiver of rights and an agreement to talk to the agents. (Doc. 55 at 2). But the form makes Defendant aware of his rights—including the right to remain silent. And the agent previously asked Defendant outside if he was willing to waive his rights and talk, and Defendant said "something along the lines of yeah, I'm just trying to figure out what's going on." (Doc. 43 at 30).

14

**C.     The Consent Search of Defendant's Phone**

Defendant argues that his consent to allow agents to search his phone was involuntary because he was not free to leave, he was not told that he could refuse to consent, he was removed from the house by a SWAT team while wearing only underwear, and (at least according to the agents) he believed there was a firearm in his house while he was a convicted felon. (Doc. 49 at 10).

"While the Fourth Amendment prohibits unreasonable searches, a search is reasonable and does not require a warrant if law enforcement obtains voluntary consent." *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (internal quotation marks and alteration omitted). That is, to be voluntary the consent must be "the product of an essentially free and unconstrained choice." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (internal quotation marks omitted). "But beyond that, there is no neat talismanic definition of voluntary consent." *Morales*, 893 F.3d at 1367 (internal quotation marks and alteration omitted). A court should consider the totality of the circumstances, including the

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

15

*United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017) (internal quotation marks omitted). It is the Government's burden to demonstrate both that consent was given and that it was done so freely and voluntarily. *United States v. Yeary*, 740 F.3d 569, 581 (11th Cir. 2014).

Defendant's consent to search his phone was voluntary. Defendant was informed of his right to remain silent, yet he elected to talk with the agents. The conversation between Defendant and the agents regarding the phone consent was "normal" and Defendant was "mild-mannered." (Doc. 43 at 40). Defendant was cooperative, he was not handcuffed, the agents' firearms were not visible, and the consent occurred in the kitchen of Defendant's home. *Id.* at 16, 19–20, 33, 40. While it is true that the agents did not expressly advise Defendant that he did not have to consent to the search of the phone, they were under no obligation to do so. *Spivey*, 861 F.3d at 1216.

Defendant makes much of the fact that agents used a SWAT-like entry when they first came into the home and that they initially placed him in handcuffs. (Doc. 49 at 10–11). But the interview where Defendant consented to the search of his phone was later in time and calmer in tone than the more chaotic circumstances surrounding the agents' initial arrival. And that matters. In *United States v. Espinosa-Orlando*, agents pulled over a car, ordered the driver out at gunpoint, and directed him to lie on the ground. 704 F.2d 507, 510 (11th Cir. 1983). Three of the

agents reholstered their guns, while a fourth stood apart with his weapon pointed to the ground. *Id.* at 513. One of the agents knelt down next to the defendant, who was still lying on the ground, and asked for consent to search the car. *Id.* The defendant consented to the search, and the Eleventh Circuit affirmed the district judge's determination that it was voluntary, noting that the agent spoke in a conversational tone, used no abusive language or threats, and that the defendant had not been handcuffed, placed in a police vehicle, or removed from the scene. *Id.* The circumstances in this case, which are noted and discussed above, are less coercive than those in *Espinosa-Orlando*, and given the totality of the facts, the Court finds that Defendant freely and voluntarily consented to the search of his phone. *See also United States v. Garcia*, 890 F.2d 355, 362 (11th Cir. 1989) (finding consent voluntary where the defendant was handcuffed and under arrest at the time of the consent).

Moreover, as the Government correctly argues, Defendant reaffirmed his consent when, shortly after the initial discussion, he signed a written consent form authorizing agents to search his phone. (Doc. 43 at 56–57; Gov. Exh. 6). Agent McLeod told Defendant that he could withdraw his consent at any time, but he never did. (Doc. 43 at 56–60). Nor did Defendant ever ask for his phone back. *Id.* at 58–60. This consent, which was not limited in time, further authorized agents to undertake the second search that occurred in September of 2019. *Id.* at 22. *See, e.g.,*

17

*United States v. Thurman*, 889 F.3d 356, 367–69 (7th Cir. 2018) (finding that a defendant's unlimited consent to search a phone during an interview concerning drug sales authorized a later forensic examination of that phone); *United States v. Plasencia*, 886 F.3d 1336, 1342–43 (11th Cir. 2018) (unlimited consent to search a boat justified a later forensic examination of a GPS unit located in the boat); *United States v. Emanuel*, 440 F. App'x 881, 885 (11th Cir. 2011) (holding that a defendant's consent to search his computer, which was not limited in time, authorized a forensic examination that occurred approximately eleven months later).

Defendant validly consented to the search of his phone, and he never subsequently withdrew that consent. As such, his motion to suppress evidence found on his phone, (Doc. 21), should be **DENIED**.

**III.    Conclusion**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motions to suppress statements and evidence, (Docs. 21, 22), be **DENIED**.

There are no other motions pending, and this matter is now **READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 15th day of June, 2020.

_____

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE